UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DIANE CONMY and MICHAEL B. REITH,

    Plaintiffs,

v.                                                                                    Case No. 4:04-CV-105

AMTRAK, CITY OF KALAMAZOO, JOHN                HON. GORDON J. QUIST
DOE and LAMPOON, INC.,

    Defendants.
_____/

## OPINION

This case arises out of a fatal collision between a car driven by decedent Erica Reith and an Amtrak passenger train. Plaintiffs Diane Conmy and Michael Reith, co-personal representatives of the estate of Erica Reith, contend that the accident was caused by the failure of a "No Left Turn When Flashing" ("NLTWF") signal light located across from a commercial parking lot driveway near the intersection of a railroad track and a public street where Reith was traveling. Plaintiffs sued the City of Kalamazoo ("Kalamazoo"), John Doe (an employee of Kalamazoo), and Lampoon Inc., owner of a Jimmy John's restaurant, out of whose parking lot Reith was exiting when she was struck by the train. Plaintiffs have settled their claims against all parties save Amtrak.

Plaintiffs' claim against Amtrak is grounded upon two theories. First, Plaintiffs maintain that Amtrak had a duty (which it breached) to inspect and maintain the warning device that was not working at the time of the accident. Second, Plaintiffs assert that because Amtrak knew that the warning signal did not work, it had a duty (which it breached) "to operate its train in a manner which would have allowed it to avoid the collision given the non-working status of the signal."

Now before the Court is Amtrak's motion for summary judgment. For the following reasons, the Court will grant Amtrak's motion.

**I. Background**

The facts, as previously set forth by the Court, are as follows. On July 8, 2003, Erica Reith, a 19 year-old college student, upon turning left out of a Jimmy John's parking lot, was struck by an Amtrak train at a railroad grade crossing over W. Michigan Ave. in Kalamazoo, Michigan. Half-roadway gates and flashing lights prevent traffic from proceeding on W. Michigan Ave. over this grade crossing when the crossing is in use. These roadway gates and flashing lights were installed pursuant to an order of the Michigan Public Service Commission in 1963, after it received a request from the Michigan State Highway Department for approval of these warning devices. The half-roadway gates and flashing lights, however, do not prevent a vehicle turning left out of the Jimmy John's parking lot in order to proceed east on W. Michigan Ave. from crossing the tracks. This is so because the half-roadway gate and flashing lights intended to prevent traffic from proceeding east on W. Michigan Ave. when the crossing is in use are located 120 feet west of the parking lot exit.

To remedy this problem, the Railroad Safety Inspection Section of the Michigan State Highway Department recommended in March 1978 that a "No Left Turn" when flashing signal be placed "immediately south of West Michigan Avenue facing motorists coming out of the [parking lot] onto Michigan Ave." Kalamazoo ultimately installed the NLTWF signal, with partial funding from the owners of the commercial property, in February 1979.

On July 8, 2003, when Reith turned left out of the parking lot, the NLTWF signal was not operating. As she was making her left turn into the right lane to proceed east on W. Michigan Ave., an Amtrak passenger train traveling northeast across W. Michigan Ave. struck Reith's car. Reith died six days later as a result of the injuries she sustained in the collision.

2

## II.     Discussion

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

**A.     Amtrak's claim of immunity under M.C.L. § 257.668(2)**

Amtrak first raises an issue that the Court examined in its order denying Amtrak's motion for partial summary judgment. Amtrak argues that Plaintiffs cannot maintain a negligence action against Amtrak under M.C.L. § 257.668(2) in the absence of an order by a public authority directing the installation of the NLTWF signal.[1] In response to the Court's determination in its previous opinion that a genuine issue of fact exists about whether Kalamazoo ordered the installation of a warning device, Amtrak now offers the testimony of Kalamazoo's chief engineer, who stated his belief that there was "no written order or directive." Amtrak contends that this is sufficient to prove that there was no order, and thus, no issue of fact. However, viewed against Plaintiffs' evidence that the Court relied on in its prior opinion in finding that an issue of material fact existed, the new

---

[1]M.C.L. § 257.668(2) states:
> The erection of or failure to erect, replace, or maintain a stop or yield sign or other railroad warning device, unless such devices or signs were ordered by public authority, shall not be a basis for an action of negligence against the state transportation department, county road commissions, the railroads, or local authorities.

3

evidence submitted by Amtrak is not dispositive, but merely supports its argument regarding the fact in question.[2] Therefore, because a question of material fact remains, Amtrak is not entitled to immunity under M.C.L. § 257.668(2) for any of Plaintiffs' claims.

**B.     Amtrak's alleged duty to maintain the signal**

Simply because M.C.L. § 257.668(2) is not a bar to the prosecution of Plaintiffs' suit, however, does not mean that Plaintiffs have established a basis for proceeding with their signal maintenance claim. That is, M.C.L. § 257.668(2) assumes, in order to in fact preclude liability, the existence of a basis for liability. Thus, even though the statute does not stand as a bar to the maintenance of a negligence claim against Amtrak, Plaintiffs must still show that Amtrak had a duty to maintain the NLTWF signal.

   **1.     <u>Amtrak had no duty under federal law to maintain the signal</u>**.

Unlike in its previous motion, Amtrak here contends that it had no legal duty to maintain the signal, nor did it ever assume a duty to maintain the signal. In their complaint and brief, Plaintiffs allege that federal law required Amtrak to repair and maintain the NLTWF signal. (Compl. ¶ 15, Brief p. 15, *et seq*.) This alleged duty derives from federal regulations, ranging from 49 C.F.R. § 234.103 to 49 C.F.R. § 234.275. These regulations do not place a duty upon the railroad, but rather presume the existence of a duty. 49 C.F.R. § 234.103 provides that "[u]pon receipt of a credible report of a warning system malfunction, *a railroad having maintenance responsibility for the warning system* shall promptly investigate the report and . . . repair . . . the warning system." (emphasis added). These regulations, then, merely beg the question of whether Amtrak had

---

[2] Plaintiffs offered a 1978 memo from Kalamazoo's assistant engineer to Kalamazoo's city manager regarding the Railroad Safety Inspection Section investigator's report that recommended installation of the signal and a letter written in 1979 by the assistant engineer to the Railroad Safety Inspector in which he mentioned that Kalamazoo ordered installation of the signal.

4

maintenance responsibility for the NLTWF signal. The question is whether Amtrak had maintenance responsibility for the signal.

It is uncontested that Kalamazoo and the private landowners entered into an agreement to install the NLTWF signal. The agreement states that the signal was "erected to control the private commercial driveway." (Amtrak's Br. in Supp. Mot. Summ. J., Ex. 8.) The agreement's preamble further states that the signal "would aid the City in traffic control in that area" and "would directly benefit" the property of the landowners. Nowhere does the agreement mention any participation by Conrail, Amtrak's predecessor in trackage rights, in any capacity, including construction, costs, or maintenance of the NLTWF signal.

Amtrak looked to Kalamazoo to perform maintenance on the NLTWF signal, for example, by calling Kalamazoo when Amtrak's inspectors noticed that the signal malfunctioned. Amtrak did not perform maintenance on the signal. Kalamazoo admitted that it never advised Amtrak that Amtrak was responsible for maintaining the signal. Kalamazoo also stated that "historically, the City has repaired the signal whenever notified by Amtrak that the signal is in need of repair." (Def.'s Br. in Supp. Mot. Summ. J., Exhibit 9 at 63.) Kalamazoo demonstrated its unilateral control over the signal when, after the accident, it altered the operation of the signal so that it flashed continuously, regardless of whether a train was approaching. Finally, although Plaintiffs contend that Amtrak had a generic key that could open the signal's control box, Plaintiffs overlook the fact that, legally, Kalamazoo possessed the only key to the NLTWF signal's control box.

Plaintiffs attempt to show that Amtrak had maintenance responsibility as a matter of federal law because the signal constituted an "active warning device" as defined by 23 C.F.R. § 646.204. 23 C.F.R. § 646.204 provides definitions for the "Railroad - Highway Projects" subpart, the purpose of which "is to prescribe policies and procedures for advancing Federal-aid projects involving

5

railroad facilities."[3] Plaintiffs contend that if they can establish that the device was an active warning device, then Amtrak must have been responsible for its maintenance and, therefore, had a duty to inspect and maintain the signal under 49 C.F.R. § 234.103. However, Plaintiffs are unable to demonstrate the creation of a duty under the combination of these regulations. Plaintiffs do not cite any case to support their argument and do not provide examples of prior instances in which a railroad was found to have a maintenance duty created under these regulations. Furthermore, the term "active warning device" does not appear anywhere in 49 C.F.R. § 234, which is the section providing for minimum maintenance, inspection, and testing standards for "highway-rail grade crossing warning systems."

It is also uncontested that Amtrak's warning system was constructed pursuant to a state governmental directive in 1963, which set forth specific guidelines and requirements. The facts that the signal was tied into Amtrak's circuitry to activate when trains approached, and that Amtrak inspectors, while performing the monthly inspections on its warning system, observed that the NLTWF signal was not operating and contacted the City of Kalamazoo to inform the City of the problem, are insufficient to show that the signal was a component of Amtrak's warning system. The Court already determined that MDOT did not order the signal as part of Amtrak's active warning system at the intersection, and Plaintiffs do not show that Amtrak ever intended for the signal to become incorporated into the active warning system.

The uncontested evidence shows that the City of Kalamazoo, not Amtrak, had maintenance responsibility for the signal and that the signal was not a component of the warning system at the

---

[3] It is undisputed that federal funds were not used for the construction of the signal and that there was no federal directive to erect the signal.

6

intersection pursuant to 49 C.F.R. § 234.103 to 234.275. Federal law does not place a duty upon Amtrak to maintain the signal.

        2.     **<u>Amtrak had no duty under state law to maintain the signal</u>**.

Plaintiffs also cite M.C.L. § 462.315 as a basis for Amtrak's duty to maintain the NLTWF signal. (Compl. ¶ 15.) M.C.L. § 462.315(3) provides that "[a]fter initial installation, all active traffic control devices . . . shall be maintained . . . by the railroad." Unlike M.C.L. § 257.668(2), however, this statute applies only where MDOT has "by order, . . . prescribe[d the] active traffic control device." Since the Court concluded in its previous Order that there is no issue of fact that MDOT did not issue an order directing the installation of the NLTWF signal, this statute does not create a duty upon Amtrak to maintain the signal.

Plaintiffs assert in their motion that Amtrak had a duty to inspect and maintain the NLTWF signal not only "by law," but also because it "assumed the duty." Plaintiffs, however, as Amtrak previously pointed out, never pled that Amtrak assumed a duty to inspect and maintain the NLTWF signal. Nor did Plaintiffs include this claim in their Second Amended Complaint, which followed Amtrak's previous motion and the Court's subsequent order. Thus, the Court need not consider this allegation. *See White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 558-69 (6th Cir. 1990) (holding that even under the standards requiring liberal construction of pleadings, a party cannot pursue unpled claims).

**C.**    **Amtrak's alleged failure to safely operate its train**

Plaintiffs claim that Amtrak had a duty to operate its train in a different manner, such as by stopping the train before proceeding through the intersection or alerting traffic by flagging, because Amtrak allegedly was aware that the NLTWF signal was malfunctioning. Plaintiffs rely on federal and state law in support of this contention.

Plaintiffs first cite 49 C.F.R. § 234.207 and § 234.105 as the basis for Amtrak's duty, alleging that Amtrak had a duty to "initiate efforts to warn highway users" at the crossing.[4] The language of these sections is similar to the regulation cited for Plaintiffs' signal maintenance claim in that the duty is imposed upon the "railroad having maintenance responsibility for the warning system."  As the Court stated, Plaintiffs have not demonstrated that Amtrak had maintenance responsibility for the signal, nor have Plaintiffs shown the signal to be a component of the warning system.

Plaintiffs argue that Amtrak breached its duty to operate its train safely because it had knowledge of the failure of the NLTWF signal. Amtrak admits that once a month for the previous nine months, while inspecting its warning system, it observed that the NLTWF signal was malfunctioning and, after every observation, contacted Kalamazoo to inform it of the problem. Amtrak, however, again contends that because it was not responsible for the maintenance of the signal, it had no duty to operate its train differently because the signal was malfunctioning.  Amtrak also argues that Plaintiffs do not present any evidence indicating that on the day of the accident, Amtrak had positive knowledge that the NLTWF signal was inoperable.  (Amtrak's Br. in Supp. Mot. Summ. J. at 24  n.25.)

Based on the facts that Amtrak had notified Kalamazoo and Kalamazoo historically maintained the signal, and based on the fact that Amtrak knew that Kalamazoo did nothing to fix the signal after nine months of notification, it is a jury question as to whether it was reasonable for Amtrak to assume that the signal was working on the day of the accident.  To turn the question

---

[4] 49 C.F.R. § 234.207(a) provides that when "any essential component of a highway-rail grade crossing system fails to perform its intended function," the component shall be repaired or replaced.  Until the repair is completed, "a railroad shall take appropriate action under section 49 C.F.R. § 234.105" in the event of an activation failure. 49 C.F.R. § 234.207(b).  49 C.F.R. § 234.105 requires that "a railroad having maintenance responsibility for the warning system shall promptly initiate efforts to warn highway users," including notifying train crews, law enforcement officers, and providing alternate means of warning to highway users, such as by stopping the train before proceeding or flagging traffic.

8

around, would a reasonable railroad have believed that the signal was fixed in one week when it had not been fixed for the nine previous months.

But Amtrak argues that Plaintiffs cannot maintain a state law claim based on Amtrak's failure to safely operate its train because federal law preempts such claims and because Plaintiffs cannot meet the exception to preemption that the malfunctioning signal constituted a "specific, individualized hazard." Amtrak cites the Supreme Court's decision in *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 113 S. Ct. 1732 (1993), as a basis for federal preemption. The plaintiff in *Easterwood* alleged that CSX was negligent under Georgia law for, among other things, operating the train at an excessive speed. The Court found that the speed claims were preempted by federal law, because 49 C.F.R. § 234.213 set maximum speed limits and, thus, covers "the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings." *Id*. at 675, 113 S. Ct. at 1743. The Court, however, declined to address whether the preemption of the speed claim barred a "suit for breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard." *Id*.

Plaintiffs argue that the malfunctioning signal constituted a "specific, individualized hazard" to which Amtrak had a duty to alter the operation of its trains traveling through the intersection. (Pls.' Br. in Opp'n to Amtrak's Mot. Summ. J. at 34.) The Sixth Circuit has not explicitly defined a "specific, individualized hazard," but it has stated that the purpose of the exception is "to keep local control over local issues, that is issues that are unique to the particular site." *Ludwig v. Norfolk Southern Ry. Co.*, 50 Fed.Appx. 743, 748 (6th Cir. 2002) (finding that a district court did not err in determining that construction at a crossing did not constitute a "specific, individual hazard"). Although courts have not agreed upon a definition as to what constitutes a

9

"specific, individual hazard" under *Easterwood*, cases cited by the Sixth Circuit are instructive. The court noted:

> Almost all of the case law on "specific individual hazards" comes from district court opinions. A specific, individual hazard is a "discrete and truly localized hazard." *Seyler v. Burlington N. Santa Fe Corp.*, 102 F.Supp. 2d 1226, 1236 (D. Kan. 2000). It "relates uniquely to the avoidance of a single, specific collision." *O'Bannon v. Union Pac. R.R. Co.*, 960 F.Supp. 1411, 1420 (W.D. Mo. 1977).

*Id*. Other courts have reached similar conclusions. For example, a "specific, individual hazard" has been described as "an engineer who sees a motorist stranded on the crossing, but nevertheless negligently fails to stop or slow his train to avoid the collision." *Herriman v. Conrail, Inc.*, 883 F.Supp. 303, 307 (N.D. Ind. 1995). In *Herriman*, the court found preemption of an excessive speed claim based on hazardous lighting, because the lighting did not constitute a specific, individualized hazard; it was "continuously present," not just at the time of the accident. *Id*. Similarly, another court held that "the exception enunciated by the *Easterwood* court encompasses the avoidance of a specific collision." *Shaup v. Frederickson*, 1998 WL 726650, at *11-12 (E.D. Pa. 1998) (finding that common law tort duty is not preempted where an engineer realizes that "a car, pedestrian, or other obstruction is unable to extricate itself from an impending collision with on-coming train" and fails to slow or stop the train).

Plaintiffs point out that they are not contending that Amtrak's engineer failed to recognize an imminent danger posed by Reith's car on the railroad tracks.[5] (Pls.' Br. in Opp'n to Amtrak's Mot. Summ. J. at 36.) Plaintiffs contend, rather, that Amtrak's negligence arose from its failure to warn the engineer that the signal was not working and require that the crew "stop and flag" the intersection. Plaintiffs cite a case from this district in support of their argument that the claim is not

---

[5] The testimony of the engineer indicates that he last saw Reith's car stopped, or moving very slowly, safely outside of the train's path. (Chiles Dep. at 59-60.)

10

preempted. In *Bakhuyzen v. National Rail Passenger Corporation*, 20 F. Supp. 2d 1113 (W.D. Mich. 1996), the court examined a claim alleging, among other things, that the "weather conditions required [defendant] to slow the train." *Id*. at 1117. The court found the following analysis in *Herriman* instructive:

> The lighting condition at the crossing did not create a situation which existed solely on the night decedent was killed . . . Further, the duty the Herrimans seek to impose is not one that would require this particular engineer to slow down, but in fact would require a substantial reduction in speed by every Conrail train entering the Bond Avenue crossing at night.

*Id*. at 1118 (citing *Herriman*, 883 F.Supp. at 307). The court determined that, unlike a lighting condition, weather conditions are not static, are not the subject of federal railroad operation regulations, and "are not capable of being encompassed within uniform national standards." *Id*. Therefore, the train operation claim was not preempted.

In the present case, the condition allegedly giving rise to Amtrak's duty - the malfunctioning signal - is a static condition, existing over a period of months, not solely at the time of the accident. Like the court noted in *Herriman*, the malfunctioning signal here would require every engineer to stop or slow down at every crossing of the intersection, not just this particular engineer at this particular time, and not just Amtrak's engineers. Plaintiffs fail to demonstrate that the malfunctioning signal constituted a specific, individual hazard to which Amtrak had a duty to slow or stop its train. Additionally, although Plaintiffs did not establish that the NLTWF signal was part of Amtrak's warning system or that Amtrak bore responsibility for the signal, federal regulations govern the precautions a railroad must take when it is aware of a failure of warning systems for which it is responsible. Therefore, Plaintiffs' common law duty claims are preempted. Plaintiffs' state law claims, based on a statute and regulation that the Plaintiffs concede "mirror the federal regulations," are also necessarily preempted. (Pls.' Br. in Opp'n to Amtrak's Mot. Summ. J. at 32.)

11

## III.  Conclusion

For the foregoing reasons, the Court will grant Amtrak's motion for summary judgment on Plaintiffs' claims.

An Order consistent with this Opinion will be entered.


Dated:  October 26, 2006                               /s/ Gordon J. Quist              
                                                                                                  GORDON J. QUIST
                                                                 UNITED STATES DISTRICT JUDGE